## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Joshua Hollamon,

No. 22-cv-2246 (KMM/LIB)

      Plaintiff,

v.

**ORDER**

County of Wright, and Dustin Miller, *in his official and individual capacities*,

      Defendants.

This excessive-force case arises out of protests, demonstrations, and direct action by activists who organized against the expansion of the Enbridge corporation's Line 3 oil pipeline in northern Minnesota during the summer of 2021. On July 29, 2021, a group of protestors, including the Plaintiff Joshua Hollamon, had assembled near the Red Lake Treaty Camp, and attempted to breach the fenced area surrounding a pipeline construction site. Their goal was to attach themselves to the large pieces of construction equipment within the fenced area and thereby temporarily halt the construction of the pipeline. Law enforcement officers detailed to the construction site attempted to stop the activists from breaching the fenced areas using a variety of tactics, including shouting warnings not to enter, firing pepperball launchers, and spraying irritants at the protestors to deter their advance. Mr. Hollamon was among the protestors who were struck by projectiles from the pepperball launchers. He brought this action against Wright County Sergeant Dustin Miller and Wright County, under 42 U.S.C. § 1983 and state law, claiming that he was injured as a result of pepperballs striking him in the head. Sergeant Miller and Wright County now

seek summary judgment on Mr. Hollamon's claims, and they move to exclude testimony of Mr. Hollamon's expert witnesses. For the reasons that follow, the Defendants' summary judgment motion is granted.

## BACKGROUND

Mr. Hollamon flew from his home in Los Angeles to Minneapolis in late July 2021 to join Enbridge Line 3 Pipeline protests near the Red Lake River, between Thief River Falls and St. Hilaire, Minnesota. Two protest sites developed on the east and west sides of the river. Larson Decl. ¶ 5 (Doc. 43). On the west side of the river was a Red Lake Treaty Camp. Larson Decl. ¶ 5. Shortly before the events giving rise to this litigation, officers from Wright County and Pennington County learned that the group of protestors that had assembled near the camp had grown. Larson Decl. ¶ 6.

During the evening of July 29, 2021, a group of protestors managed to shut down work at the construction site for several hours by locking themselves to a vehicle at the entrance gate. Larson Decl. ¶ 7. Around 7:45 p.m., a group of protestors, including Hollamon, approached the fenced barrier of the construction site with ladders, rugs, and "sleeping dragons" or "lock boxes"—devices used by activists to lock themselves to machinery or equipment so that the machines cannot function.[1] The barrier surrounding the construction site consisted of an outer fence and an inner fence separated by several yards of "No Man's Land" between the two. Larson Decl. ¶ 10. The fences are topped with

---

[1] Defs.' Mem. in Supp. of Mot. for Summ. J ("Defs.' SJ Mem.") 6 n.2 (citing *Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1127–28 (9th Cir. 2002), *as amended* (Jan. 30, 2002)) (Doc. 42).

barbed wire and posted with "No Trespassing" signs. Larson Decl. ¶ 10. In the area of the No Man's Land most relevant to this litigation, the earth forms a raised mound or berm in the center and slopes downward on either side toward both the inner and outer fences. Larson Decl., ¶ 3, Ex. 2, Pennington County Video 0:00:01–0:00:10.[2]

Mr. Hollamon and others erected ladders to climb over the outer fence and enter the No Man's Land. Larson Decl. ¶ 13; Pennington County Video 0:00:20–0:01:00. Mr. Hollamon was there to carry a ladder and help others get across the fences. Hollamon Dep. 72 (Doc. 44-3). Officers shouted to the activists not to cross and warned them that they would be trespassing if they came over the fence.[3] Ramstad Decl. ¶ 8, Ex. 7, Berg Bodycam Video 19:48:25–19:48:30[4] (Doc. 44). According to Wright County Deputy Lisa Fox, several warnings were given to the protestors who approached the fence. Fox Dep. 13 (Doc. 44-8). Specifically, "[t]hey were warned that, by coming over the fence, they were trespassing and they will -- they will be under arrest if they came over the fence." Fox Dep. 14. Sergeant Miller recalled that "over the loud speaker, announcements were given requesting the protestors to turn around." Miller Dep. 34–35 (Doc. 44-9). Mr. Hollamon understood that the protestors were not allowed to breach the fence, and when asked, "Did

---

[2] The Court's citations to the Pennington County Video reference the elapsed time shown on the software used to playback the footage.

[3] An incident report authored by Wright County Sheriff's Office Sergeant Todd Jorgenson states: "Warnings were given that the offenders were trespassing and they were under arrest." Wright County Incident Report 3 (Doc. 44-1). The bodycam video recording does not reflect such a specific declaration.

[4] Chisago County Sergeant R. Scott Berg's bodycam video bears a timestamp in the upper right corner. The Court's citations to the "Berg Bodycam Video" refer to this timestamp.

you . . . hear any police commands that you understood to mean: Go back over the fence?" he said, "I think so. Probably." Hollamon Dep. 81.

Eventually, Hollamon and several dozen other activists cleared the outer fence and entered the No Man's Land. Because law enforcement officers were using pepperball launchers to deter the protestors from advancing farther. Mr. Hollamon and others took cover behind the berm. Over the course of the encounter, Mr. Hollamon was struck by pepperballs several times, including several impacts to his head.[5] Mr. Hollamon alleges that he suffered a concussion as a result.

### *Pepperball Launchers and Training*

Wright County Sergeant Dustin Miller and Deputy Lisa Fox were both at the pipeline construction site on July 29, 2021, armed with less-lethal[6] pepperball launchers. Both fired pepperballs at the advancing protestors. At the time that Mr. Hollamon and others approached the outer fence and officers began firing pepperballs at the protestors, Pennington County had authorized such action if protestors attempted to breach the outer fence. Miller Dep. 9–10; Fox Dep. 10. The "PAVA" (Pelargonic Acid Vanillyamide) pepperball rounds release an irritant white powder meant to bring about compliance through inflicting pain. Jorgenson Dep. 17–18 (Doc. 44-2). The pepperballs themselves are "capsaicin-filled round[s]." Miller Dep. 19. They both irritate the person struck by them

---

[5] This fact is disputed. Defendants contend that there is no evidence that Hollamon was ever struck in the head with a pepperball round. However, as explained in this Order, the Court finds that the evidence, viewed in the light most favorable to Mr. Hollamon, permits a reasonable inference that he was struck in the head by a pepperball fired by Sergeant Miller.

[6] The parties refer to the pepperball launchers as "non-lethal" and "less-lethal" weapons.

when the chemicals inside the round are released on impact and can cause discomfort from the impact itself. Jorgenson Dep. 17–18, 25–26.

Sergeant Miller and Deputy Fox had been trained to use the pepperball launchers. Their training taught them to fire at center mass and both agreed that they were not permitted to aim the launcher at someone's neck or head.[7] Miller Dep. 10–11; Fox Dep. 10–11, 25; *see also* Jorgenson Dep. 27 (discussing risks from head shots and "6 o'clock hold" for targeting). Miller testified that deploying a pepperball at someone's body is considered nonlethal force. Indeed, he testified that it is nonlethal force even if the pepperball round is deployed from a close range to someone's head or neck. Miller Dep. 17. Deputy Fox testified that the pepperball is "not a less lethal round, it is a nonlethal round" and firing it at a person's head would not be considered use of deadly force. Fox Dep. 12, 14.

Wright County Sheriff's Office Sergeant Tood Jorgenson explained that the training given to Sergeant Miller and Deputy Fox would have covered the dangers of certain target areas. Jorgenson Dep. 25–26. Sergeant Jorgenson agreed that the training would have specified not to intentionally shoot at the head, neck, or spine unless doing so was within department policy and deadly force is authorized. Jorgenson Dep. 26. Sergeant Jorgenson testified that the training covered the fact that head shots could result in severe and permanent injury or death. Jorgenson Dep. 27.

---

[7] Sergeant Miller testified that he did not fire a pepperball round at anyone's head on July 29, 2021, and he believes that all of the rounds he fired struck where they were aimed. Miller Dep. 11.

### Breaching the Outer Fence and Pepperball Deployment

As noted above, Mr. Hollamon asserts that pepperball rounds fired by Sergeant Miller struck him several times, including in his head. Hollamon Dep. 89–90. When Mr. Hollamon climbed the ladder to go over the outer fence and enter the area between the two fences, he recalls being shot at while he was on the ladder. As he was breaching the outer fence, he was struck by a pepperball in either his left or right arm.[8] Hollamon Dep. 56. Video of the incident shows Mr. Hollamon fall or jump from the ladder into the No Man's Land as he came over the fence. Sergeant Miller fired the pepperball launcher in the direction of the activists coming over the outer fence. Pennington County Video 0:00:50–0:00:55. Plumes of white powder can be seen around the top of the ladders, but the video does not clearly show whether or where any pepperball may have struck Mr. Hollamon at that point. *Id.* Mr. Hollamon recalls that the next round that struck him hit his goggles directly after he jumped down from the ladder. Hollamon Dep. 89–90; Phillips Decl., Ex. 2 (video still) (Doc. 54).

After coming over the fence, Hollamon and others crouched behind the berm and pulled the ladders down to themselves. Pennington County Video 0:01:00–0:02:15. Some of the activists climbed to the top of the berm, shielding themselves from the pepperball rounds using a rug or heavy blanket. Pennington County Video 0:02:15–0:02:30; Miller Dep. 28. Several more activists joined them atop the berm, crouching behind the blanket

---

[8] Hollamon fell or jumped from the ladder as he breached the outer fence, but he does not claim to have been injured because of the fall. Hollamon Dep. 80–81; Pennington County Video 0:00:50–0:00:55. He claims to have suffered injury only from the pepperball rounds striking his head.

for cover while Sergeant Miller continued to fire pepperballs in their direction intermittently. Pennington County Video 0:02:30–0:04:30.

Approximately four minutes after the protestors began coming over the fence, Pennington County Sheriff's Office Deputy Melissa Larson received a call over the radio for officers to stop using the pepperball rounds unless the protestors attempted to breach the inner fence. At that point, she shouted to the officers standing off against the group of activists poised atop the berm to stop firing the pepperball launchers. Pennington County Video 0:3:30–0:04:34. Video of the incident indicates Sergeant Miller stopped firing any pepperball rounds shortly after that message was relayed.[9]

After Deputy Larson conveyed the order to cease firing the less-lethal munitions, the group of activists atop the berm began making their way down the berm toward the inner fence carrying the ladders and rugs. Pennington County Video 0:04:34–0:05:00. Mr. Hollamon crawled to the top of the berm with a ladder. Pennington County Video 0:04:45–0:04:56. As he approached the top of the mound and passed the ladder to the group approaching the inner fence, Mr. Hollamon laid on his stomach or crouched low to the ground. Pennington County Video 0:04:56–0:05:30.

While Hollamon was lying on his stomach atop the berm, he recalls being shot in the head with a pepperball round. Hollamon Dep. 89, 90. He testified that a round struck him in the head, leaving a white powder residue on his hat. Hollamon Dep. 90; Phillips

---

[9] Throughout the encounter on July 29, 2021, Sergeant Miller testified that he may have fired his launcher up to 100 times, but he wasn't certain of the exact number of pepperball rounds he discharged. Miller Dep. 15–16, 20, 39. Deputy Fox did not fire in Mr. Hollamon's direction, and she is not a Defendant in this case.

Decl., Ex. 3 (video still showing white residue on Hollamon's hat); *see also* Fomby Report ¶ 39 (white marks on Hollamon's hat consistent with pepperball strike), Doc. 54-4. During this portion of the video, Sergeant Miller does not appear to have fired the pepperball launcher. Pennington County Video 0:04:34–0:05:30.

Over the next few minutes, as the phalanx of activists inched forward on the berm toward the inner fence, Sergeant Miller swapped out his pepperball launcher for a canister of Oleorsin Capsicum chemical spray. Pennington County Video 0:06:40–0:09:55 During this time, Mr. Hollamon laid on his stomach alongside a ladder that he slowly pushed forward, eventually passing it to the group of protestors who were farther down the berm approaching the inner fence. Pennington County Video 0:06:40–0:10:00; *see also* Hollamon Dep. 93 ("At that point I wasn't certain if I was ready to go all the way up to that second fence, but I was at least going to push the ladder over to them.").

Eventually, another group of protesters who had gathered in the No Man's Land behind the berm rushed over the berm toward the inner fence with additional ladders. They approached the inner fence a short distance away from initial group, drawing the attention of the law enforcement officers that had gathered near the fence. Pennington County Video 0:10:00–0:11:40. Mr. Hollamon crawled down the berm to join the initial group and grabbed the ladder as the rest of the original group advanced on the inner fence. Pennington County Video 0:11:35–11:45. As various members of the group attempted to put the ladders up on the inner fence and throw blankets over the barbed wire, officers came back to where the activists were attempting to scale the inner fence. The officers, including Sergeant Miller, began deploying chemical spray, and attempted to pull the blankets off

the top of the fence. Pennington County Video 0:11:45–0:14:05. Mr. Hollamon unsuccessfully tried to erect a ladder on the inner fence during this sortie, and then sat down behind the ladder to stabilize it for others. Pennington County Video 0:11:55. From a greater distance away, Chisago County Sergeant R. Scott Berg fired a 40-millimeter less-lethal impact round that struck a protestor.[10] Berg Bodycam Video 20:04:45–20:5:00.

Most of the activists climbed away, taking cover between the berm and the outer fence. Officers succeeded in removing a blanket from the top of the fence, but the protestors managed to salvage the ladder that Mr. Hollamon had been stabilizing. Eventually, Hollamon and the others who had remained at the inner fence retreated to join them. Pennington County Video 0:14:05–0:19:00. The retreating activists washed their faces with bottles of water to counteract the effects of the pepperball rounds and chemical spray.

### *Hollamon's Arrest and Injuries*

Many of the activists who had entered the No Man's Land climbed back over the outer fence and left the area. It is undisputed that none of these individuals was arrested or identified. Mr. Hollamon and just over a dozen others remained in the No Man's Land, but at some remove from the inner fence. Pennington County Video 0:19:00–0:44:00. Approximately twenty-five to thirty minutes after the initial approach on the inner fence had been thwarted, they regrouped atop the berm. Pennington County Video 0:44:00–0:49:00. Several protestors began putting goggles and masks back over their faces. Pennington County Video 0:49:00–0:53:00.

---

[10] Sergeant Berg is not a defendant in this action and Mr. Hollamon does not claim that he was struck by any 40mm round.

The protestors erected a ladder on the inner fence, and four of them crossed the fence and were immediately taken into custody. Pennington County Video 0:53:30–0:57:00. Several officers entered the No Man's Land after the fourth protestor went over the inner fence and began arresting the protestors remaining there. One removed the ladder, which Mr. Hollamon was holding, from the fence inner fence.[11] Pennington County Video 0:056:40–0:56:45. At some point during this exchange, Mr. Hollamon believes he lost consciousness. Hollamon Dep. 100–01.

The Officers who entered the area between the fences began placing protestors under arrest. One officer attempted to place Mr. Hollamon under arrest and secure his hands with zip ties. Pennington County Video 0:57:00–0:59:00. Mr. Hollamon attempted to flee up the berm, but he was grabbed by several officers and subdued.[12] Pennington County Video 1:01:00–1:02:00.

Mr. Hollamon and other protestors who were arrested were taken to Pennington County Jail. Mr. Hollamon was charged with misdemeanors for trespassing and obstruction of the legal process and released from jail on Monday, August 2, 2021. Ramstad Decl., Ex. 14; Hollamon Dep. 28.

According to Mr. Hollamon, while at the jail he had trouble with his balance and slurred speech. Hollamon Dep. 116. He requested to be taken to the hospital, but the request is not documented in his jail file. Hollamon Dep. 116; Ramstad Decl., Ex. 12. Since the

---

[11] The officer who removed the ladder was a Waseca County Deputy who is not a defendant in this case.

[12] Sergeant Miller was not among the officers that placed Mr. Hollamon under arrest.

incident, Mr. Hollaman has experienced headaches, disorientation, memory loss, and other symptoms. Hollamon Dep. 116, 123–31, 168–69, 175. As a result of his symptoms, Mr. Hollamon lost his full-time job in May 2022, he has been unemployed since October 2022, and he is unable to perform the same type of work he did before the incident. Hollamon Dep. 14, 17, 133–36, 142–43.

### Procedural History

In his original complaint, Mr. Hollamon brought claims against Pennington County and unidentified law enforcement officers, John Does 1–8, for excessive force and for failing to provide him with vegetarian meals during his time in custody. Compl. (Doc. 1-1). Mr. Hollamon served the original complaint on Pennington County in August 2022, and Pennington County removed the case to federal district court on September 15, 2022. Mr. Hollamon filed an Amended Complaint against Pennington County and John Does 1–4. Am. Compl. (Doc. 8). In the Amended Complaint, Mr. Hollamon asserted excessive force claims against the unidentified officers who shot him with less lethal projectiles and the officer who "physically assaulted" him after he had been hit with the projectiles. *Id.* ¶¶ 4–5. Eventually, Mr. Hollamon stipulated to dismissal of Pennington County and the parties stipulated to a further amendment of the complaint. (Doc. 24, 26, 28, 29).

On May 30, 2023, Mr. Hollamon filed his Second Amended Complaint, which is now the operative pleading in this case, naming Wright County and Sergeant Miller as Defendants. Second Am. Compl. (Doc. 30). In the First Cause of Action, pursuant to 42 U.S.C. § 1983, Mr. Hollamon claims that Sergeant Miller violated his Fourth and Fourteenth Amendment rights. He alleges that Sergeant Miller used excessive force by

striking him with the pepperballs during the July 29, 2021 incident. *Id.* ¶¶ 12–19. In the Second and Third Causes of Action, Mr. Hollamon brings state common law claims for assault and battery against Wright County and Sergeant Miller for the same actions. *Id.* ¶¶ 20–31.

At the conclusion of discovery, Defendants filed the pending motion for summary judgment. Defendants also filed a motion to exclude certain opinion testimony offered by two of Mr. Hollamon's witnesses: Dr. Uzma Samadani, a neurologist; and Charis Boke, an anthropologist certified in CPR and as a Wilderness First Responder. The Court held a hearing on the motions on February 22, 2024. (Doc. 58).

## DISCUSSION

Defendants argue that they are entitled to summary judgment on Mr. Hollamon's § 1983 excessive-force claim because Sergeant Miller's use of the pepperball launcher, which was intended to disperse a crowd rather than restrain, could not have been a Fourth Amendment seizure as a matter of law. Next, Defendants argue that Sergeant Miller is entitled to qualified immunity on Mr. Hollamon's excessive-force claim. They assert that Sergeant Miller's actions were constitutionally reasonable under the circumstances. And they argue that, even if the constitutional question cannot be resolved at the summary judgment phase, he is entitled to qualified immunity because it was not clearly established that using pepperballs in the manner that he did was unconstitutional. Finally, Defendants contend that they are entitled to summary judgment on Mr. Hollamon's state law assault and battery claims under the doctrine of official immunity.

## I.   Legal Standards

### A.  Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Dowden v. Cornerstone Nat'l Ins. Co.*, 11 F.4th 866, 872 (8th Cir. 2021). The moving party must demonstrate that the material facts are undisputed. *Celotex*, 477 U.S. at 322. A fact is "material" only if its resolution could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials, but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Id.* at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021). A dispute of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Irvin v. Richardson*, 20 F.4th 1199 (8th Cir. 2021). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . ." *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012) (quoting *Anderson*, 477 U.S. at 255).

### B. Qualified Immunity

"Qualified immunity provides some protection against suits for civil damages against government officials." *Dundon v. Kirchmeier*, 85 F.4th 1250, 1255 (8th Cir. 2023). To prevail against an assertion of qualified immunity, a plaintiff must show that the officer "violated a constitutional right, and that the unlawfulness of [the officer's] conduct was clearly established at the time." *Martinez v. Sasse*, 37 F.4th 506, 509 (8th Cir. 2022). This is "a two-pronged inquiry. The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." *Smith v. Conway Cnty., Ark.*, 759 F.3d 853, 858 (8th Cir. 2014) (cleaned up). The second is "whether the right in question was clearly established at the time of the violation." *Id.* (cleaned up). District courts may consider either of these two prongs first. *Quraishi v. St. Charles Cnty., Mo.*, 986 F.3d 831, 835 (8th Cir. 2021).

"To be clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (brackets removed); *see also Fisherman v. Launderville*, 100 F.4th 978, 981 (8th Cir. 2024) (explaining that "every reasonable officer" in the officer's position "would have understood" that the alleged conduct violated the constitutional right at issue) (quotation omitted). "While the plaintiffs need not identify 'a case directly on point,' controlling authority or a robust consensus of persuasive authority must put the constitutional question 'beyond debate.'" *Dundon*, 85 F.4th at 1255 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011)). "There may also be the rare obvious case where the unlawfulness of the officers' conduct is sufficiently

clear even though existing precedent does not address similar circumstances." *Quraishi*, 986 F.3d at 835 (quotations omitted).

In deciding issues of qualified immunity, the Supreme Court has instructed courts against "defin[ing] clearly established law at a high level of generality, since doing so avoids the crucial questions whether the official acted reasonable in the particular circumstances that he or she faced." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018) (quotations omitted).

## C. Excessive Force Claims

The Fourth Amendment protects the individual right to be free from unreasonable seizures. U.S. Const., amend. IV. "To establish a Fourth Amendment violation, the claimant must demonstrate that a seizure occurred and that the seizure was unreasonable." *Dundon*, 85 F.4th at 1255. This makes the issue of whether a person was "seized" within the meaning of the Fourth Amendment a "threshold question" in an excessive force case. *Id.*; *Quraishi*, 986 F.3d at 839 (same).

A Fourth Amendment seizure can occur through "physical force or a show of authority that in some way restrains the liberty of the person." *Torres v. Madrid*, 592 U.S. 306, 311 (2021) (cleaned up); *see also Quraishi*, 986 F.3d at 839 (same). For cases involving use of physical force,[13] "[a] seizure is an 'application of physical force to restrain

---

[13] Although Fourth Amendment cases have analyzed the issue of seizure by show of authority in terms of whether or not a reasonable person would have believed that he was not free to leave, the Eighth Circuit has explained that such an inquiry "make[s] little sense . . . while an officer restrained the person's freedom of movement through physical force because the force itself necessarily—if only briefly—restrained the person's liberty." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1208–09 (8th Cir. 2013) (cleaned up).

movement, even when it is ultimately unsuccessful.'" *Quraishi*, 986 F.3d at 839 (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)); *see also Torres*, 592 U.S. at 325 ("We hold that the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued."). In deciding whether the use of physical force constitutes a seizure, courts must analyze "whether the challenged conduct *objectively* manifests an intent to restrain." *Torres*, 592 U.S. at 317. "[T]he amount of force [used] remains pertinent in assessing the objective intent to restrain." *Id.* The analysis does not "depend on the subjective perceptions of the seized person." *Id.*

If the facts demonstrate that a Fourth Amendment seizure has occurred, the issue of whether the force used to effect that seizure was excessive is judged by "'the totality of the circumstances.'" *Mitchell v. Kirchmeier*, 28 F.4th 888, 898 (8th Cir. 2022) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). Courts evaluate the "particular circumstances" to determine "whether the amount of force used was objectively reasonable." *Kohorst v. Smith*, 968 F.3d 871, 876 (8th Cir. 2020) (quotation omitted). Courts consider the severity of the suspected criminal activity justifying the seizure; "whether the suspect poses an immediate threat to the safety of the officers or others"; and any resistance or attempted flight by the suspect. *Mitchell*, 28 F.4th at 898. Other relevant considerations include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; [and] the severity of the security problem at issue. . . ." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

## II.    Analysis

Having reviewed the record and taken the reasonable inferences from the facts in the light most favorable to Mr. Hollamon, the Court finds that Sergeant Miller is entitled to qualified immunity on the excessive force claim. First, the Court finds that no reasonable jury could conclude that Sergeant Miller's use of the pepperball launcher constituted a seizure. Second, even if the use of the pepperballs in this case could be considered a "seizure," the law did not clearly establish such a conclusion.

### A. Seizure

The threshold question here is whether Sergeant Miller's use of force constituted a seizure. As discussed, for a seizure to occur within the meaning of the Fourth Amendment as a result of an officer's application of physical force, there must be a "'use of force with intent to restrain.'" *Cole v. Lockman*, No. 21-cv-1282 (PJS/DLM), 2024 WL 328976, at *5 (D. Minn. Jan. 29, 2024) (quoting *Torres*, 592 U.S. at 317). This issue is determined by "'whether the challenged conduct *objectively* manifests an intent to restrain.'" *Id.* (quoting *Torres*, 592 U.S. at 317). "Accidental force will not qualify. Nor will force intentionally applied for some other purpose." *Torres*, 592 U.S. at 317.

Based on the summary judgment record, a reasonable jury could not conclude that Sergeant Miller's use of the pepperball launcher objectively manifested an intent to restrain. Start with the undisputed material facts. There is no dispute that the fenced area contained no trespassing signage. The evidence shows that officers shouted warnings at the protestors not to cross into the fenced area and that doing so would constitute trespassing. The video evidence, specifically Officer Berg's bodycam footage, confirms that as

protestors approached the fenced area, they were told to stop and not to cross the outer fence. After several protestors began coming over the outer fence and entering the No Man's Land, Hollamon points to no evidence indicating that he was told to remain in place, nor that officers physically prohibited the protesters from leaving through use of pepperball rounds or otherwise. And during the entire period in which Sergeant Miller fired pepperball rounds in Mr. Hollamon's direction, no officer entered the No Man's Land between the fences to apprehend any of the trespassing protestors.

The video evidence indicates that Sergeant Miller stopped firing pepperball rounds at the group of protestors around four and a half minutes after protestors first started coming over the fence. Several minutes after Sergeant Miller ceased using the pepperball launcher, the protestors, including Mr. Hollamon, continued to advance toward the inner fence, attempting to erect ladders and use the blankets or rugs they were carrying to enter the construction site. At that point, Sergeant Miller and other officers used OC chemical spray to again try to stop the protestors from advancing. The officers still did not come into the No Man's Land to arrest anyone as they stopped the protestors' advance. Deterred from trying to enter the construction site by this stand-off with the officers, Mr. Hollamon and other protestors retreated away from the inner fence. Some, like Mr. Hollamon, took cover behind the berm, but many of the protestors went back over the outer fence and left the construction site. The officers did not prevent any of those protestors from leaving and made no effort to arrest any of them. Nor did the officers enter the No Man's Land to arrest those, like Hollamon, who had remained at the construction site.

The first arrest of any protestor did not occur until almost thirty-five minutes after Sergeant Miller stopped firing pepperballs. And an officer from Waseca County placed Mr. Hollamon under arrest nearly fifty minutes after Sergeant Miller ceased firing pepperball rounds. Sergeant Miller was not among the arresting officers.

Given these circumstances, Sergeant Miller did not seize Mr. Hollamon by firing pepperballs at him. The Court "begin[s] by identifying the 'seizure.'" *Cole v. Bone*, 993 F.2d 1328, 1332 (8th Cir. 1993); *see also Ludwig v. Anderson*, 54 F.3d 465, 470 (8th Cir. 1995) (indicating that the initial question is "what seizures occurred"). Because Mr. Hollamon alleges that the use of pepperballs was the excessive force, the proper focus in this case is on the portion of the encounter when Sergeant Miller was deploying the pepperball launcher in the direction of Mr. Hollamon and other protestors, not when Mr. Hollamon was later arrested.[14] Second Am. Compl. ¶¶ 1, 9–19. Hollamon does not assert any excessive-force claim here against any of the officers who ultimately placed him under arrest. *Cf. Wolk v. City of Brooklyn Ctr.*, 2024 WL 3382826, at *2 (8th Cir. Jul. 12, 2024) (observing that the plaintiff did not claim that officers' actions of throwing some protestors to the ground during arrests, "which tends to show an intent to apprehend rather than disperse," caused his injuries).

With the focus necessarily on the firing of pepperballs, the undisputed facts show that Sergeant Miller and the other officers around him stayed behind the inner fence, did not enter the No Man's Land where protestors were advancing toward them, did not

---

[14] Mr. Hollamon does not claim, for example, that Sergeant Miller's use of OC spray as Hollamon and other protestors approached the inner fence constituted excessive force.

surround or encircle Mr. Hollamon or the other protestors, and used pepperballs to slow the protestors' approach. During this period of the encounter, no action of the officers, including the firing of pepperballs, prevented Mr. Hollamon or anyone else, from turning around, going back to the outer fence, or leaving the area entirely. Indeed, the only reasonable inference is that the use of these munitions was to deter the protestors from breaching the inner fence and get them to turn around and leave the no-trespassing area.

The Court finds the district court's conclusion that "no seizure occurred" in *Dundon v. Kirchmeier*, 577 F. Supp. 3d 1007, 1040 (D.N.D. 2021), to be instructive on this point. There, the court explained:

> The undisputed facts show law enforcement, even at the height of protest on November 20, 2016, remained behind the blockade on the north side of the Bridge and behind the concertina wire. Law enforcement did not march toward protestors in an attempt to move them in any direction nor did they encircle and herd Plaintiffs and protestors. Instead, they stood at the line and protestors approached them. The video evidence shows protestors pushing toward law enforcement while being subjected to less-lethal force. Aerial footage shows protestors moving on the Bridge, the sides of it, and gathering in numbers south of the Bridge.
>
> . . . .
>
> The officers in this case applied less-lethal force not to herd Plaintiffs into a certain location in such a way that protestors were unable to get away nor did they encircle them without a way out. Instead, in this case, protestors, including all of the named-Plaintiffs were free to leave and disengage law enforcement contact.

*Id.*[15]

The officers' use of force and the surrounding circumstances here were not meaningfully different than the relevant facts in *Dundon*. Sergeant Miller and other officers did not herd the protestors into an area that prevented them from having a way out, and the protestors were free to disengage by leaving the no-trespassing area. Indeed, many of them did so. In fact, the video evidence confirms that the pepperball rounds did not stop Mr. Hollamon from continuing his advance toward the inner fence to support a ladder for other protestors trying to enter the construction site. Nor did the use of pepperballs prevent him from disengaging from law enforcement for nearly half an hour when he partially retreated behind the berm to the second fence to rest and pour water on his face. The reasonable inference from these facts is that Mr. Hollamon could have gone back over the outer fence and left the scene without being arrested at any point during the encounter, but he chose not to do so.

These details distinguish Mr. Hollamon's excessive force claim from other cases in which courts have rejected defendants' arguments that no seizure occurred. For example,

---

[15] *See also Keup v. Sarpy County*, No. 8:21-cv-312, 2023 WL 8829298, at *18–19 (D. Neb. Dec. 21, 2023) (granting defendants' motion for summary judgment because the officers "were trying to clear an area in Omaha by dispersing (not arresting) individual within the area" and one officer "clearly intended to disperse Keup when he fired pepperballs at him"); *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 48 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023) (granting motion to dismiss excessive force claims where plaintiffs' allegations showed that officers "did not restrain them or attempt to seize them in place," but rather "attempted to cause the protestors and fleeing crowd to leave their location . . . [a]nd the plaintiff allege that they all did in fact leave" the square where the force was used); *Ferris v. Dist. of Columbia*, No. 1:23-cv-481-RCL, 2023 WL 8697854, at *8–11 (D.D.C. Dec. 15, 2023) (finding that plaintiffs failed to state a claim because their complaint did not allege facts showing an intent to restrain, but rather an effort by officers to "forc[e] protestors to leave particular areas, not remain there").

in *Cole v. Lockman*, the court found that the plaintiffs presented evidence that would allow a jury to find a seizure occurred because they were surrounded by officers in an alcove and maced. No. 21-cv-1282 (PJS/DLM), 2024 WL 328976, at *5–6 (D. Minn. Jan. 29, 2024) ("[A]t the moment when Eck and Lockman deployed their pepper spray, plaintiffs were surrounded in the alcove by riot police . . .; in other words, plaintiffs had nowhere to *go*, or to be dispersed *to*.").

Very recently, in *Marks v. Bauer*, No. 23-1420, 2024 WL 3382568, at *3–4 (8th Cir. July 12, 2024), the Eighth Circuit affirmed a district court's decision denying summary judgment, explicitly rejecting the officer's argument that no seizure occurred. However, the facts of *Marks* are meaningfully different than the facts here. The court focused on when the officer fired the 40mm projectile into the plaintiff's face, noting that the plaintiff was within five to ten feet away from the defendant and was falling to the ground. *Id.* at *1, 3. This was a split second after another officer, with whom the plaintiff was engaged in a physical altercation, had pushed the plaintiff away with his service baton. *Id.* at *1, *3. In finding that a seizure occurred, the *Marks* court emphasized that the officer "was not dispersing a crowd the moment he aimed and shot" the plaintiff. *Id.* at *3. It contrasted that moment from the evidence regarding what happened earlier in the encounter. *Id.* The court explained, "before Marks was shot, Officer Bauer's general deployment of projectiles allowed officers to form a perimeter and evacuate [a] stabbing victim," and "officers were able to form a second perimeter around another injured individual." *Id.* Further, "most of the crowd had retreated and only a couple dozen individuals remained around the second individual who needed medical attention." *Id.* The deployment of pepperballs by Officer

Miller in this case more closely resembles the preliminary use by Officer Bauer in *Marks* than it does Bauer's point-blank deployment of a projectile to Marks's face.

Other cases where courts have found that seizures occurred are also distinguishable because they do not show an intent to disperse. *See Nelson v. City of Davis*, 685 F.3d 867, 874 (9th Cir. 2012) (finding a seizure occurred at the time officers fired pepperballs that struck plaintiff in the eye where "[t]he students were attempting to leave the party but the police blocked their means of egress and did not provide any instructions for departing the complex"); *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 263 (S.D. Ohio Apr. 30, 2021) (granting motion for preliminary injunction in part based on finding plaintiffs were likely to succeed on the merits of their claim that they were seized where "protestors were subject to physical force and less-lethal projectiles *without a means of escape or egress*"), *modified sub nom. Alsaada v. City of Columbus, Ohio*, No. 2:20-cv-3431, 2021 WL 3375834 (S.D. Ohio June 25, 2021); *Rauen v. City of Miami*, 06-21182-CIV, 2007 WL 686609, at *8 (S.D. Fla. Mar. 2, 2007) (finding that plaintiffs stated an unreasonable seizure claim where they alleged their "freedom of movement was terminated by the deliberate use of force [including less-lethal munitions] and skirmish lines to herd and then encircle Plaintiffs in an area in which they otherwise would not have been").

Mr. Hollamon argues that a jury could reasonably find in his favor on the issue of seizure because the evidence shows that protestors were advised they were "under arrest" upon entering the area between the two fences. In support of this argument, he relies on two statements in Sergeant Jorgenson's incident report. Sergeant Jorgenson wrote that as protestors were trying to breach the fenced area, "[w]arnings were given that the offenders

were trespassing and *they were under arrest*." Later, apparently, during the protestors' attempts to breach the inner fence "[m]ore verbal commands to stop trespassing and that they were under arrest were issued." Wright County Incident Report 3.

For two reasons, the Court is unpersuaded by this argument. First, even if officers did shout at protestors that they were under arrest, that alone would not constitute a seizure. It would merely be a show of authority, and it is undisputed that Mr. Hollamon (and other protestors) did not submit to that show of authority. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("An arrest requires *either* physical force . . . *or* where that is absent, *submission* to the assertion of authority."); *see also Torres*, 592 U.S. at 311 (explaining that *Hodari D.* "principally concerned a show of authority"). Thus, even if a jury were to believe that a warning was communicated to the protestors that they were "under arrest," that would not transform the scenario here into a seizure.

Second, the full context of this encounter does not permit a reasonable inference that the force at issue manifested an intent to restrain, even crediting the quoted provisions of the police reports over contrary evidence. It is undisputed that the fences were posted with signs saying that the construction site was a no-trespass area, and officers shouted warnings informing protestors that crossing the fences would constitute trespassing. At least some of those warnings indicated that the protestors *would be arrested*. Even if other warnings stated that the protestors were "under arrest" and those warnings coincided with the deployment of pepperballs, it is undisputed that officers did not take any steps, in conjunction with the use of force, to prevent the advancing protestors from retreating. No officer entered the area between the fences to hem in the protestors. No officer acted in a

way that cut off the open route for protestors to retreat from the fenced area. And no officer effected an arrest until long after the pepperballs were fired, and then only arresting those who still had not dispersed. A reasonable jury could not conclude that a stray warning that protestors were "under arrest" transformed this encounter from one demonstrating an objective intent to disperse into an objective intent to restrain.

In sum, the Court concludes that a reasonable jury could not find that Hollamon was seized, so he cannot demonstrate that there was a constitutional violation.[16]

**B. Clearly Established Law**

In addition, the Court finds that Sergeant Miller is entitled to qualified immunity because it was not clearly established, as of July 29, 2021, that firing pepperball rounds to disperse a group of protestors engaged in a trespass constituted a seizure, even if an argument can now be made that it did. Mr. Hollamon does not point to any controlling authority, nor a robust consensus of persuasive authority, that would have given fair warning to Sergeant Miller that his conduct violated the constitution. *Graham v. Barnette*,

---

[16] This Court shares Chief Judge Patrick Schiltz's "reservations about the 'legal black hole' created by distinguishing protestors being 'free to leave' and being 'free to stay,'" including the implication that if force is used to disperse, there would be no Fourth Amendment seizure regardless of the level of force used "to disperse or repel a crowd—including fire hoses, police dogs, live ammunition, and even flame throwers." *Cole*, 2024 WL 328976, at *5 (quoting Shawn E. Fields, *Protest Policing and the Fourth Amendment*, 55 U.C. Davis L. Rev. 347, 361, 364 (2021)). In *Cole*, Judge Schiltz avoided the need to resolve this tension because the plaintiffs "submitted evidence to allow a reasonable jury to find that [the defendants'] use of pepper spray did, in fact, objectively manifest an intent to restrain the plaintiffs." *Id.* (citing *Torres*, 592 U.S. at 317). Mr. Hollamon did not present such evidence, so the question is closer to the surface here. Of course, this case does not involve the use of force akin to the examples identified in *Cole*. But it is difficult to imagine the situation in which the use of live ammunition or a flame thrower would not implicate the Fourth Amendment even if a government official were brazen enough to suggest that such methods were legitimate crowd dispersal techniques.

5 F.4th 872, 887 (8th Cir. 2021) ("The plaintiff has the burden to prove that a right was clearly established at the time of the alleged violation."). The cases Mr. Hollamon cites in his opposition are factually distinguishable or include statements of the law regarding seizure that define the right at issue too broadly to be useful in the qualified immunity analysis in this lawsuit.

Relying on *Brendlin v. California*, 551 U.S. 249, 254 (2007) and *Torres v. Madrid*, 592 U.S. 306, 317 (2021), Hollamon argues that it was clearly established that Sergeant Miller's use of force was a seizure because the pepperball rounds were physical force that restrained his freedom of movement. Pl.'s Opp'n 14. The reliance on *Brendlin* is misplaced. As the Eighth Circuit recently explained in a case involving the issue of whether law enforcement's use of less-lethal munitions constituted a seizure, *Brendlin* "held that, during traffic stops, passengers are seized." *Quraishi*, 986 F.3d at 840. The *Quraishi* court found *Brendlin* to be "inapposite because [it] involve[d] police action that terminated or restricted freedom of movement," not to disperse a crowd. *Id.* Hollamon's reliance on *Brendlin* also assumes an objective intent to restrain rather than disperse. But the undisputed material facts discussed above do not indicate that Sergeant Miller's firing of the pepperball launcher objectively manifested anything other than an intent to disperse. *See Dundon*, 85 F.4th at 1257 ("*Brendlin* does not address whether a seizure occurs when the intent conveyed to the subject of force is that he should disperse and leave the scene.").

The Supreme Court's decision in *Torres* also does not help Mr. Hollamon. Although *Torres* was decided on March 25, 2021, a few months before the events at issue in this case, it did not place beyond debate the constitutional issue of whether a seizure occurred

26

under the particular circumstances presented here. In *Torres*, two officers approached Torres' car, and as she attempted to drive away, they "fired their service pistols to stop her . . . striking her twice in the back and temporarily paralyzing her left arm." 592 U.S. at 310. She did not stop immediately but was later apprehended at the hospital. *Id.* Taking the facts in the light most favorable to Torres, the Supreme Court held that "the officers' shooting applied physical force to her body and objectively manifested an intent to restrain her from driving away" where they had "order[ed] Torres to stop and then sho[t] to restrain her movement." *Id.* at 318. Because the factual landscape of *Torres* is so different, it does not provide fair warning to an officer that the use of a pepperball launcher in this case was a seizure. *See Dundon*, 85 F.4th at 1256 ("In any event, *Torres* involved force used to *apprehend* a suspect . . . and did not address whether force used only to compel departure from an area constitutes a seizure.").

Mr. Hollamon also suggests that *California v. Hodari D.*, 499 U.S. 621 (1991) is the clearly established law that defeats qualified immunity. It does not. In *Hodari D.*, Hodari and his companions fled when they saw officers approaching. While Hodari was running away, without noticing one of the officers was approaching him, he tossed aside "what appeared to be a small rock." 499 U.S. at 622–23. After he threw away the object, the officer in pursuit tackled Hodari and placed him in handcuffs. *Id.* at 623. Law enforcement recovered the object Hodari discarded and learned that it was crack cocaine. *Id.* In the juvenile case against Hodari, he sought to suppress the recovered drugs, arguing that he had been seized when the officer was running towards him and that the recovery of the drugs was the product of an unreasonable seizure. *Id.* at 623–24. The issue before the

Supreme Court in *Hodari D.* was "whether, at the time he dropped the drugs, Hodari had been 'seized' within the meaning of the Fourth Amendment." *Id.* at 623. The *Hodari D.* Court further emphasized that "[t]he narrow question before us is whether, with respect to a show of authority as with respect to the application of physical force, a seizure occurs even though the subject does not yield." *Id.* at 626.

The *Hodari D.* Court held that when a suspect does not submit to a show of authority, no seizure has occurred. *Id.* ("An arrest requires *either* physical force . . . *or* where that is absent, *submission* to the assertion of authority.").[17] The Court also explained the common law rule that "the slightest application of physical force" effects an arrest, *id.* at 625, and Mr. Hollamon suggests that this clearly establishes that Sergeant Miller's application of physical force by striking him with pepperball rounds, therefore, constitutes a seizure. However, *Torres* clarified that "[w]hile a mere touch can be enough for a seizure," a seizure only occurs where force is applied with the intent to restrain. 592 U.S. at 317. Moreover, *Hodari D.* did not involve the use of less-lethal munitions, and it did not consider the difference between intent to seize and intent to restrain. Given these stark differences in the circumstances of *Hodari D.* and the facts of this case, relying on it for purposes of the clearly established prong of the qualified immunity inquiry would require defining the right at issue far too broadly. *Wesby*, 583 U.S. 48, 63–64. *Hodari D.* does not

---

[17] As explained above, the undisputed evidence in this case demonstrates that Mr. Hollamon did not submit to any show of authority, and was not seized until well after the use of force by Sergeant Miller on which Hollamon bases his excessive force claim. Therefore, Mr. Hollamon's contention that this case involved a seizure because protestors were told they were "under arrest" when they entered the fenced area misses the mark. *See* Pl.'s Opp'n 10–11 & n.5.

demonstrate that a reasonable official would have understood that using a pepperball launcher under the circumstances of this case constituted a seizure.

The other Eighth Circuit cases on which Mr. Hollamon relies also do not point to a different outcome. Mr. Hollamon cites *Ludwig v. Anderson*, 54 F.3d 465 (8th Cir. 1995). The *Ludwig* court explained that, under *Hodari D.*, "although a seizure is 'effected by the slightest application of physical force,' despite later escape, that seizure does not continue during 'periods of fugitivity.'" 54 F.3d at 471 (quoting *Hodari D.*, 499 U.S. at 625) (cleaned up). But the facts of *Ludwig* are unlike the facts of this case. The evidence in *Ludwig* showed that the decedent, James Ludwig, was emotionally disturbed, brandished a knife at officers, was maced, and fled. One officer attempted to hit Ludwig with his squad car to stop him from getting away. Hitting Ludwig with the squad vehicle failed to apprehend him, and after he managed to run away again, several officers "formed a semicircle around Ludwig" and maced Ludwig in the face again. That tactic likewise failed to subdue Ludwig. When he ran toward an area where populated by a fair number of pedestrians, Ludwig was shot with live ammunition by two officers, causing his death. *Id.* at 468–69. The Eighth Circuit held that Ludwig "was twice seized in a potentially unreasonable manner: first, when [one officer] attempted to hit Ludwig with the squad car, and second, when Ludwig was ultimately shot." *Id.* at 471. The court also noted that although Ludwig was seized when he was maced, the officers did not violate any clearly established right by doing so. *Id.*

*Ludwig* does not clearly establish that the use of a pepperball launcher constitutes a seizure under the circumstances presented here. At least one court applying *Ludwig* has

observed that it clearly establishes that "law-enforcement officers seize a person for Fourth Amendment purposes when they surround him and deploy pepper spray against him." *Cole v. Lockman*, No. 21-cv-1282 (PJS/DLM), 2024 WL 328976, at *9 (D. Minn. Jan. 29, 2024). But unlike the situation in *Ludwig*, the evidence in this case does not indicate that any officers surrounded Mr. Hollamon or otherwise restricted his freedom of movement at the time that Sergeant Miller struck him with pepperball rounds.[18]

In his opposition, Plaintiff also cites *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012), which the Court briefly distinguished above on the question of whether a seizure occurred.[19] *Nelson* does not carry Mr. Hollamon's burden to show that the right was clearly established at the time of the alleged violation. The plaintiff, Timothy Nelson, was a student at U.C. Davis attending a party along with nearly 1,000 people at an apartment complex when he was shot in the eye with a pepperball gun inside a "narrow and confined" breezeway space. 685 F.3d at 872–74. The Ninth Circuit rejected the officers' argument that no seizure occurred, reasoning that the officers intentionally directed the use of force at the crowd in which the plaintiff was standing, evidence showed that the officers intended to shoot at the crowd and not merely over their heads, and the plaintiff was rendered

---

[18] Mr. Hollamon also cites *Schulz v. Long*, 44 F.3d 643, 647 (8th Cir. 1995), but does not explain how it provided Sergeant Miller with fair warning that his conduct in this case constituted a seizure. In relevant part, the *Schulz* court affirmed the district court's decision to grant a motion for judgment as a matter of law at trial in favor of one of the officers involved in an altercation with the plaintiff. *Id.* The officer did not touch or otherwise use physical force on the plaintiff, and the plaintiff did not submit to the officer's show of authority. *Id.* at 647. *Schulz* provides no clearly established law for purposes of the qualified immunity inquiry we must engage in here.

[19] In his opposition, Mr. Hollamon does not explicitly argue that *Nelson* provides clearly established law placing Sergeant Miller on notice that his use of the pepperball launcher constituted a seizure, Pl.'s Opp'n 15, but the Court has also considered it in this context.

immobile by the pepperball impact until an unknown person removed him from the scene. *Id.* at 875–77. Although the analysis in *Nelson* provides support for Mr. Hollamon's theory in this case, the Eighth Circuit recently rejected the notion that *Nelson* clearly established that the use of force to disperse a crowd is a Fourth Amendment seizure. *Dundon*, 85 F.4th at 1256 ("While *Nelson* may lend support to the protestors' theory, it does not demonstrate clearly established law as of November 2016 that the officers' use of force to disperse the protestors was a seizure.").

*Dundon* itself supports the Court's conclusion that as of July 29, 2021, the state of the law in this area did not put the constitutional question in this case beyond debate. In *Dundon*, the Eighth Circuit held that it was not clearly established as of November 2016 that the use of force to disperse a group of protestors was a seizure. 85 F.4th at 1257. The use of force at issue in *Dundon* included officers firing rubber bullets, lead-filled beanbag rounds, and blasts of water from a fire truck's hose at a group of protestors assembled on a North Dakota bridge to demonstrate against the construction of the Dakota Access Pipeline. *Id.* at 1254, 1256. In addition to finding that *Nelson* did not provide fair notice that use of force to disperse constituted a seizure, the *Dundon* court explained that "the law is not clearly established in this area." *Id.* at 1256.

> As of 2014, it was not clearly established that the use of tear gas by police to disperse news reporters from the site of public unrest and protests was a seizure. *Quraishi v. St. Charles Cnty., Missouri*, 986 F.3d 831, 839–40 (8th Cir. 2021). As of 2018, it was not clearly established that a push used to repel a subject seeking to enter a government facility was a seizure. *Martinez v. Sasse*, 37 F.4th 506, 510 (8th Cir. 2022). The protestors here suggest a legally significant difference between the use of tear gas or pepper spray, which disperses through the air, and the

> deployment of munitions such as rubber bullets or bean bags.
> Our decisions, however, have recognized a potential
> distinction between force used with intent to apprehend and
> force used with intent to disperse or repel. Those decisions did
> not place officer on notice that the existence of a seizure
> depends on the type of force applied for the purpose of
> dispersing a crowd.

*Id.* The *Dundon* court identified several other cases that failed to clearly establish that force

used to disperse a crowd constituted a seizure. *Id.*[20] Mr. Hollamon does not point to any

authority that post-dates the November 2016 events at issue in *Dundon* and pre-dates the

July 29, 2021 incident in this case to demonstrate that the state of clearly established law

has changed.

The Eighth Circuit's decision in *Wolk v. City of Brooklyn Center* further supports

granting qualified immunity to Sergeant Miller in this case. There, the Eighth Circuit found

that the district court should have dismissed the plaintiff's excessive-force claims because

it was not "clearly established as of April 2021 that officers effect a seizure when they use

force to disperse protestors." *Wolk*, 2024 WL 3382826, at *2. Taking the allegations as true

---

[20] The *Dundon* court provided this lengthy string cite indicating that prior Eighth Circuit
decisions involved officers using "force to apprehend a suspect" rather than to disperse:

> *Baude v. Leyshock*, 23 F.4th 1065, 1070 (8th Cir. 2022) (suspect
> pepper sprayed during mass arrest); *Small v. McCrystal*, 708 F.3d
> 997, 1002 (8th Cir. 2013) (suspect tackled from behind and
> arrested); *Montoya v. City of Flandreau*, 669 F.3d 867, 873 (8th Cir.
> 2012) (officer performed a ''leg sweep'' and threw a suspect to the
> ground during an arrest); *Johnson v. Carroll*, 658 F.3d 819, 823–24
> (8th Cir. 2011) (suspect thrown to the ground and maced during
> arrest); *Shannon v. Koehler*, 616 F.3d 855, 858 (8th Cir. 2010)
> (suspect slammed to the ground during arrest).

85 F.4th at 1256.

for purposes of a motion to dismiss, the *Wolk* court explained that the plaintiff "was shot in the knee with a rubber bullet by an unknown officer who fired through the fence less than 10 feet away while [the plaintiff] attempted to move away." *Id.* at *1. Further, the court noted that Mr. Wolk alleged he was injured when officers used "tear gas, flashbang grenades, pepper spray, and rubber bullets to disperse the crowds" of protestors. *Id.* Mr. Hollamon has not demonstrated that between the April 2021 events at issue in *Wolk* and the July 29, 2021 events at issue in this case, it became clearly established law that the use of force to disperse a crowd constitutes a seizure.

Nevertheless, Mr. Hollamon suggests that this Court should not follow *Dundon*'s lead because, unlike most of the protestors in *Dundon* he was eventually arrested. According to Hollamon, the fact of his arrest makes this case more like *Mitchell v. Kirchmeier*, 28 F.4th 888 (8th Cir. 2022). It is true that the *Dundon* court distinguished *Mitchell* on grounds that "the protestor in [*Mitchell*] 'was arrested,' so the court had no occasion to consider whether a use of force to disperse rather than to apprehend constituted a seizure." *Dundon*, 85 F.4th at 1256 (citing *Mitchell*, 28 F.4th at 894). However, *Mitchell* itself provides no indication that the arrest of the plaintiff occurred under circumstances similar to those at issue here. The *Mitchell* court explained that after the plaintiff positioned himself in front of other protestors who were being shot at with lead-filled beanbags and rubber bullets, officers fired upon him with those same munitions, and then he was placed under arrest. 28 F.4th at 894. Neither *Mitchell* itself nor *Dundon*'s characterization of it make clear that if an arrest follows the use of less-lethal munitions, the subject is necessarily seized by the use of the less-lethal weapon. And neither case considers an arrest

so removed in the time and circumstance from the deployment of less-lethal munitions as the one here.

For these reasons, the Court finds that it was not clearly established as of July 29, 2021, that Sergeant Miller's use of the pepperball launcher constituted a seizure for purposes of the Fourth Amendment. Consequently, Sergeant Miller is entitled to qualified immunity and Mr. Hollamon's excessive force claim fails as a matter of law.

### C. Plaintiff's Deadly Force Argument

Finally, Plaintiff asserts that Sergeant Miller's use of the pepperball launcher constituted a Fourth Amendment seizure because Sergeant Miller used "deadly force," which he argues always constitutes a seizure regardless of the "intent to disperse" analysis explored above. Hollamon points to evidence that he believes could lead a reasonable jury to conclude that Sergeant Miller's use of the pepperball launcher in this case constitutes deadly force, including: (1) his own testimony that he was struck in the head several times by pepperballs; (2) photographs of powder residue on his hat and goggles suggesting that pepperballs struck him in the head; (3) Sergeant Miller's testimony that he believed each pepperball round he fired hit its intended target; (4) Sergeant Miller's statement that the pepperball launcher was in good working order; (5) evidence indicating that Hollamon sustained a concussion; (6) Wright County training materials indicating that officers should not target the head, neck, or spine unless doing so is within department policy and use of deadly force is authorized; and (7) Sergeant Jorgenson's testimony that Wright County training indicated that the head should not be targeted without deadly force authorization. *See* Pl.'s Opp'n 13–14, 18–19 (arguing that use of pepperball launcher constituted deadly

force). Although this argument points to a complex issue in the law, the Court declines to analyze this case under a "deadly force" standard for the reasons explained below.

As this Court has previously observed, deadly force has been defined as "such force that creates a substantial risk of death or serious bodily harm." *Anderson v. Avond*, 631 F. Supp. 3d 721, 729 (D. Minn. 2022) (quoting *Church v. Anderson*, 249 F. Supp. 3d 963, 968 (N.D. Iowa 2017)); *see also id.* at 729 n.4 (discussing consensus in definition among circuit courts). And both the Supreme Court and the Eighth Circuit have stated that the use of deadly force is a seizure. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (stating "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment"); *Ludwig v. Anderson*, 54 F.3d 465, 470 (8th Cir. 1995) ("Apprehension by deadly force is a seizure subject to the Fourth Amendment."); *Cole ex rel. Richards v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020) ("A police officer's use of deadly force against a suspect is a 'seizure' under the Fourth Amendment.") (citing *Smith v. Kilgore*, 926 F.3d 479, 485 (8th Cir. 2019)).

But Eighth Circuit precedent has not illuminated how lower courts ought to resolve a tension in the case law. On the one hand, force used without an intent to restrain (perhaps regardless of the level of force employed) does not constitute a seizure. And on the other hand, caselaw indicates that when an officer uses "deadly force," a seizure has unquestionably occurred for purposes of the Fourth Amendment. So how does one resolve whether there has been a seizure if the force used could be characterized as "substantially likely to cause death or serious bodily injury," but the facts demonstrate no objective manifestation of an intent to restrain?

For its part, even though *Torres* involved officers firing live ammunition at a fleeing suspect, the Supreme Court's decision offers no real guidance for how lower courts should synthesize its objective "intent to restrain" rule, 592 U.S. at 317–18, with the Supreme Court's prior decisions indicating that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment," *Garner*, 471 U.S. at 7. The answer may be that when an officer fires live ammunition at a suspect, there is necessarily an objective manifestation of an intent to apprehend because such an extreme use of force cannot suggest an intent to disperse to any reasonable person. Indeed, *Garner* involved an officer's use of a traditional firearm, as did the Eighth Circuit case cited by Mr. Hollamon—*Cole ex rel. Richards v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020).

This is not to suggest that shooting live ammunition from a firearm is the only way that officers can employ deadly force. Indeed, very recently, the Eighth Circuit, observed that under some circumstances, the use of "less-lethal force" can be considered deadly force. *See Marks*, 2024 WL 3382568, at *7 ("[W]e have previously noted that less-lethal force can amount to deadly force depending on the situation.") (citing *Ludwig*, 54 F.3d at 473).[21] Because the *Marks* court found that the evidence showed an intent to restrain, 2024 WL 3382568, at *4, it did not have to address whether the use of arguably deadly force constitutes a seizure when the evidence shows only an intent to disperse. Instead, *Marks*

---

[21] *See also Robinette*, 854 F.2d at 912 ("[M]any law enforcement tools possess the potential for deadly force, including a . . . police officer's nightstick, . . . and a police officer's vehicle. . . . Indeed, as any faithful reader of mystery novels can attest, an instrument of death need not be something as obviously lethal as a gun or knife. The ubiquitous 'blunt object' kills just as effectively.").

addresses the issue of deadly force in the context of evaluating the reasonableness of the seizure and whether it was clearly established that the use of force at issue was unreasonable. *Id.* at *4–7. And in the wake of *Marks*, it remains true that a police tool can be used without an objective intent to restrain a suspect (*i.e.*, in a manner that doesn't constitute a seizure under *Torres*), and nevertheless have the capacity to cause significant harm. For less-lethal munitions in particular, the law is simply far from settled on when their use might constitute deadly force and, therefore, necessarily constitute a seizure for purposes of the Fourth Amendment.

Notwithstanding this doctrinal lack of clarity, or perhaps due to it, the Court concludes that as of July 29, 2021, a reasonable officer in Sergeant Miller's shoes would certainly not have known that it was unlawful to use a pepperball launcher to disperse trespassing protestors, nor that using it in the manner he did constituted a seizure through the use of deadly force. Mr. Hollamon has not directed the Court to any authority that clearly establishes an officer's use of a pepperball launcher for the purpose of dispersing a crowd constitutes a seizure vis-à-vis deadly force, even when pepperballs hit someone in the head.[22] Notably, *Dundon* held that it was not clearly established in November 2016, that the use of force to disperse, rather than to restrain, constituted a seizure. 85 F.4th at

---

[22] In a letter filed after the briefing was completed in this case, Mr. Hollamon argued that the Eighth Circuit's ruling in *Marks* obligates the Court to "deny qualified immunity and summary judgment" in this case because he "submitted evidence to convince a jury . . . that Sgt. Miller targeted him with pepperball rounds that were intentionally fired at Hollamon's head." Pl.'s Letter 2 (Doc. 62). But as explained above, *Marks* does not clearly establish that "less-lethal" force used to disperse transforms into a Fourth Amendment seizure simply because the force used has the potential to cause significant harm.

1257. As the record before the district court in *Dundon* makes clear, that case involved the use of less-lethal munitions (such as rubber bullets and lead-filled beanbags), resulting in protestors' sustaining serious bodily injury.[23] *See Dundon v. Kirchmeier*, 577 F. Supp. 3d 1007, 1029 (D.N.D. 2021) (acknowledging evidence presented by the plaintiffs that many had suffered significant injuries, including "a woman who nearly lost her arm, a man who had a gran mal seizure, a woman shot in the eye, an elder who lost consciousness and was revived at the scene, a man with internal bleeding, a man shot in the back with less-lethal munitions near his spine, and multiple fractures.").

There is reason to think that, despite a pepperball launcher's potential to cause a significant injury, the Eighth Circuit would not characterize it as "deadly force" under the circumstances here. The best indication that a pepperball launcher might not be characterized as deadly force is found in *Kuha v. City of Minnetonka*, 365 F.3d 590 (8th Cir. 2003).[24] The *Kuha* court considered whether a police dog trained in the bite-and-hold method of subduing a suspect was a tool of deadly force. *Id.* at 597 ("Before reviewing Kuha's specific claims, we briefly address, and reject, Kuha's contention that a police dog

---

[23] The nature of the projectiles used in *Dundon* undermines Plaintiff's attempt to distinguish that case by arguing that the *Dundon* court "was not addressing the use of deadly force, but a lower level of force that was designed to disperse a crowd." Pl.'s Opp'n 14 n.8. The level of force used in *Dundon* was at least as great as, if not greater than, the level of force used in this case. The difference here is that Mr. Hollamon has made an argument that tests a lack of clarity in the law, whereas the plaintiffs in *Dundon* either did not raise the issue, or the court did not address it.

[24] *Kuha*'s analysis of the municipality's liability under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978) was abrogated by *Szabla v. City of Brooklyn Park, Minn.*, 486 f.3d 385, 395–96 (2007) ("[W]e abandon Part II.C. of our opinion in *Kuha* as circuit precedent."). That abandoned portion of the *Kuha* opinion is not relevant to this proceeding.

constitutes deadly force."). After noting that no other federal appeals court had held that a "properly trained police dog is an instrument of deadly force," and that several other courts had expressly rejected that proposition, the *Kuha* court explained that "'the mere recognition that a law enforcement tool is dangerous does not suffice as proof that the tool is an instrument of deadly force.'" *Id.* at 598 (quoting *Robinette v. Barnes*, 854 F.2d 909, 913 (6th Cir. 1988)). Because the court found that the "likelihood of death from the use of a properly trained police dog to apprehend a suspect [is] sufficiently remote as to preclude its characterization as deadly force," the Court found that "review of excessive force claims involving police dogs is properly governed by the general standard established in *Graham* rather than the deadly force standard of *Garner*." *Id.* The focus, therefore, was on the probability that the force applied could cause *death*.

The conclusion that use of a pepperball launcher generally should not be analyzed through the deadly-force lens finds further support in *Vera Cruz v. City of Escondido*, 139 F.3d 659, 661 (9th Cir. 1997), a case cited with approval by the Eighth Circuit in *Kuha*, 365 F.3d at 598. In *Vera Cruz* the Ninth Circuit confronted an argument that the use of a properly trained police dog constitutes deadly force because it has the potential to cause death *or* serious bodily injury. 139 F.3d at 661–63. The *Vera Cruz* court observed that *Garner*, which involved the firing of live ammunition at a fleeing suspect, did not "cover[] all uses of force that might result in death, no matter how remote the possibility." 139 F.3d at 661. *Vera Cruz* explained that the "death or serious bodily injury" definition cited by several courts in excessive force cases is drawn from the Model Penal Code's (MPC) definition of what constitutes deadly force. *Id.* at 661. The court expressly "reject[ed] the

MPC's definition as inapposite to the Fourth Amendment context." *Id.* at 661–62. *Vera Cruz* contrasted the context addressed by the MPC's definition—where criminal defendants must "assume responsibility for all the harm they cause by their anti-social conduct"—with the issue presented in excessive force cases—the objective reasonableness of the officer's conduct in light of the circumstances they confront. *Id.* at 662. Of greatest import here, the *Vera Cruz* court reasoned that "the MPC's formulation, containing the disjunctive 'or,' would turn the deadly force rule into a 'serious bodily injury' rule, rendering *Garner*'s distinction between ordinary force and deadly force a virtual nullity. That is plainly not what the Supreme Court had in mind." *Id.*

In *Kuha*, the Eighth Circuit found that reasoning from *Vera Cruz* to be persuasive. 365 F.3d at 598 n.3 (agreeing with *Vera Cruz*'s reasoning that the MPC's definition was less useful in the police brutality context). And in reaching its own conclusion, the *Kuha* court focused only on the likelihood that the use of a police dog would result in a suspect's *death*, not the possibility that it could cause *serious bodily injury*. 365 F.3d at 598 ("We find the *likelihood of death* from the use of a properly trained police dog to apprehend a suspect sufficiently remote as to preclude its characterization as deadly force.") (emphasis added).

That reasoning is equally applicable to the use of a pepperball launcher. Under these circumstances, the Court finds that Sergeant Miller was not on notice that such a use of

force would necessarily have been a seizure under *Garner*, 471 U.S. at 7 (apprehension by deadly force is a seizure), or *Cole*, 959 F.3d at 1132 (same).[25]

For these reasons, the Court finds that Sergeant Miller is entitled to qualified immunity on Mr. Hollamon's excessive-force claim and grants Defendants' motion for summary judgment with respect to Plaintiff's First Cause of Action.[26]

### D. State Claims

Having concluded that Sergeant Miller is entitled to summary judgment on Plaintiff's Fourth Amendment excessive-force claim under § 1983, all that remains are Plaintiff's state law claims of assault and battery against Sergeant Miller and Wright County. "A district court exercising original jurisdiction over federal claims also has supplemental jurisdiction over state claims which 'form part of the same case or

---

[25] Even though *Nelson* held that the use of the pepperball launcher was a seizure under the circumstances, the court did not characterize device as an instrument of deadly force, and it evaluated the reasonableness of the force under the standard articulated in *Graham*. *Nelson*, 685 F.3d at 879–83; *see also Buck v. City of Albuquerque*, 549 F.3d 1269, 1275, 1289–90 (10th Cir. 2008) (no suggestion that use of pepperballs was deadly force); *Keup*, 2023 WL 8829298 (no mention of deadly force in discussion of police use of pepperball rounds).

[26] Mr. Hollamon raises an interesting and important issue regarding the historical underpinnings of the law of qualified immunity and argues that the Court should deny such immunity to Sergeant Miller. Pl.'s Opp'n 22–26. Specifically, he points to recent scholarship indicating that the foundation of the Supreme Court's recognition of qualified immunity rests upon a scrivener's error that occurred when the law passed by Congress and signed by President Ulysses S. Grant was eventually codified as § 1983. *Id.* at 22–24 (citing Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201, 235 (2023)); *see also* Phillips Decl., Ex. 8 (certified copy from National Archives). According to Plaintiff, the phrase omitted from the bill that was actually signed into law provides the clear congressional intent that common-law immunities do not apply to § 1983 actions. Pl.'s Opp'n at 24 (citing *Rogers v. Jarrett*, 63 F.4th 971, 979–80 (5th Cir. 2023) (Willett, J., concurring)). Though this argument sets forth a coherent and compelling rationale for why the Supreme Court and the federal appellate courts might rethink the doctrine of qualified immunity, Mr. Hollamon essentially suggests that this Court should find the doctrine inapplicable despite binding precedent to the contrary. This Court lacks the power to overrule the Eighth Circuit or the Supreme Court.

controversy' as the federal claims. *Starkey v. Amber Enterprises, Inc.*, 987 F.3d 758, 765 (8th Cir. 2021) (quoting 28 U.S.C. § 1367(a)). Under 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction" over remaining state law claims when all of the claims over which it has original jurisdiction have been dismissed. Although neither party in this case asks the Court not to exercise jurisdiction over the supplemental state law claims, district courts may consider the issue sua sponte. *Porter v. Williams*, 436 F.3d 917, 920 (8th Cir. 2006).

The factors a court should consider when deciding whether to exercise supplemental jurisdiction over remaining state law claims include "judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Ordinarily, when all federal claims are dismissed prior to trial, these factors "will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 350 n.7; *Barstad v. Murray Cnty.*, 420 F.3d 880, 888 (8th Cir. 2005).

Mr. Hollamon filed this lawsuit in state court, and Pennington County removed the case to federal court on September 15, 2022. Pennington County only asserted that the case was within this Court's federal-question jurisdiction pursuant to 28 U.S.C. § 1331 because it alleged violations of 42 U.S.C. § 1983. The only grounds alleged for exercising

jurisdiction over the state law claims is supplemental jurisdiction under 28 U.S.C. § 1367.[27]

Therefore, the Court finds that there has been no showing that there is original jurisdiction

over the remaining state claims.

Having considered the relevant factors under 28 U.S.C. § 1367(c)(3), the Court

finds it appropriate to decline to exercise supplemental jurisdiction over Mr. Hollamon's

state law claims. Under circumstances where all claims over which there are original

jurisdiction have been dismissed, the Eighth Circuit has long held that district courts should

"exercise judicial restraint and avoid state law issues wherever possible." *Condor Corp. v.

City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990). Declining to exercise supplemental

jurisdiction over the assault and battery claims will conserve judicial resources because the

Court will not be required to conduct an analysis of the merits of the official-immunity

defense raised in the Defendants' motion for summary judgment. Doing so will also serve

the interests of comity by leaving those issues of state law to be addressed by a state court.

In the event additional litigation over those claims occurs, the parties will have benefited

from the discovery exchanged in this case to minimize any inconvenience.

Accordingly, the Court declines to exercise supplemental jurisdiction over

Plaintiff's state-law claims. The Court has discretion to dismiss state law claims without

---

[27] When he filed this case, Mr. Hollamon alleged that he was a resident of Los Angeles. Although the parties may be from different states, Defendants did not assert diversity jurisdiction as a ground for removal. Even if they could have done so closer to the time of removal, it is now well past the time for any amendment of the removal notice, so the Court cannot rely on 28 U.S.C. § 1332(a) as a separate basis of original jurisdiction. *See Blankenship v. Philadelphia Indem. Ins. Co.*, No. 4:12-cv-293-SNLJ, 2012 WL 3765107, at *2 (E.D. Mo. Aug. 30, 2012) (concluding that even though diversity jurisdiction may exist, the defendant was barred from asserting it by failing to do so within the time limitation of 28 U.S.C. § 1446(b)) (citing *Lindsey v. Dillard's Inc.*, 306 F.3d 596, 600 (8th Cir. 2002)).

prejudice or to remand the matter to the state court. "[A] remand generally will be preferable to a dismissal when the statute of limitations on the plaintiff's state-law claims has expired before the federal court has determined that it should relinquish jurisdiction over the case." *Carnegie-Mellon Univ.*, 484 U.S. at 351–52. Minnesota's statute of limitations for assault and battery claims is two years. Minn. Stat. § 541.07; *Hester v. Redwood Cnty.*, 885 F. Supp. 2d 934, 944 (D. Minn. 2012) (citing *Stradlund v. Hawley*, 532 F.3d 741, 746 (8th Cir. 2008)). Because the statute of limitations may have expired on Mr. Hollamon's state law assault and battery claims, the Court remands those claims to state court. *Wlliams v. On-Belay of Minn., Inc.*, No. 17-cv-564 (JRT/SER), 2017 WL 4990526, at *5 (D. Minn. Oct. 31, 2017).

### E.  Motion to Exclude Expert Testimony

The Court finds above that the Defendants' are entitled to summary judgment on Plaintiff's Fourth Amendment excessive-force claim and that the state tort claims should be remanded to state court pursuant to § 1367(c)(3). The Court reached those conclusions without finding it necessary to rule on the admissibility of expert testimony, which is the subject of Defendants' motion to exclude. (Doc. 47). Accordingly, the Court finds that Defendants' motion to exclude expert testimony is moot and denies that motion without prejudice.

### ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED THAT**

1.    Defendant's Motion to Exclude Expert Testimony (Doc. 47) is **DENIED WITHOUT PREJUDICE** as moot.

2.      Defendant's Motion for Summary Judgment (Doc. 40) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.  The motion is **granted** as to Plaintiff's excessive force claim under 42 U.S.C. § 1983 (First Cause of Action), which is **DISMISSED WITH PREJUDICE**; and

b.  The motion is **denied** as to Plaintiff's state claims for assault and battery, which are his Second and Third Causes of Action.

3.      The Court declines to exercise supplemental jurisdiction over Plaintiff's state law assault and battery claims pursuant to 28 U.S.C. § 1367(c)(3) and those claims are **REMANDED** to the State of Minnesota District Court, Ninth Judicial District, County of Pennington.

**Let Judgment be entered accordingly.**

Date: August 5, 2024                         *s/Katherine Menendez*
                                             Katherine Menendez
                                             United States District Judge